**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

ENEIDA ROSARIO

    Plaintiff,

       v.    CIVIL NO.: 21-1480 (MEL)

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**OPINION AND ORDER**

## I.    Procedural and Factual Background

Pending before the court is Ms. Eneida Rosario's ("Plaintiff") appeal from the decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability benefits under the Social Security Act. ECF No. 17. On May 21, 2014, Plaintiff filed an application for Social Security benefits alleging that she initially became unable to work due to disability on March 1, 2014 ("the onset date"). Tr. 29, 730. Prior to the onset date, Plaintiff worked as a "home attendant." Tr. 40. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018. Tr. 31. Plaintiff's disability claim was denied on October 30, 2014 and upon subsequent reconsideration. Tr. 784–88, 790–92. Thereafter, Plaintiff requested a hearing which was held on May 15, 2015 before an Administrative Law Judge ("the ALJ"). Tr. 73–99, 100–04. On August 1, 2017, the ALJ issued a written decision finding that Plaintiff was not disabled. Tr. 760–780. Thereafter, Plaintiff requested review of the ALJ's decision.

On December 3, 2018 the Appeals Council granted Plaintiff's request for review and remanded it to the ALJ for additional proceedings. Tr. 782–83. The Appeals Council ordered the ALJ to resolve the following issues:

- Ensure that all of the claimant's Spanish-language evidence is translated (HALLEX I-2-5-76).
- Obtain updated additional evidence concerning the claimant's impairments in order to complete the administrative records in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512).
- If warranted, obtain evidence from a medical expert related to impairments the nature and severity of and functional limitations resulting from the claimant's mental impairments (20 CFR 404.1513a(b)(2)).
- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations . . . . The residual functional capacity should reflect function-by-function restrictions associated with the severe impairments (Social Security Ruling 96-8p).

Tr. 782–83. Upon remand, on June 17, 2020 the ALJ held a telephone hearing "due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic" during which Plaintiff appeared but was unrepresented by counsel. Tr. 28, 53–57. On July 1, 2020, the ALJ issued a written decision again finding that Plaintiff was not disabled. Tr. 28–42. Thereafter, Plaintiff once again requested review of the ALJ's decision. The Appeals Council denied Plaintiff's request for review, rendering the ALJ's July 1, 2020 decision the final decision of the Commissioner, subject to judicial review. Tr. 1–8. Plaintiff filed a complaint in the United States District Court on October 1, 2021 seeking review of the decision of the Commissioner. ECF No. 3. The Commissioner has opposed Plaintiff's complaint and both parties have filed supporting memoranda. ECF Nos. 17, 21.

II.    **Legal Standard**

**A. Standard of Review**

Once the Commissioner has rendered a final determination on an application for disability benefits, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were founded upon sufficient evidence. Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error." López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).

Additionally, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The standard requires "'more than a mere scintilla of evidence but may be somewhat less than a preponderance' of the evidence." Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

While the Commissioner's findings of fact are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir.

1986) (per curiam); <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)). Moreover, a determination of substantiality must be made based on the record as a whole. <u>See Ortiz</u>, 955 F.2d at 769 (citing <u>Rodríguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981)). However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." <u>Id</u>. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." <u>Rodríguez Pagán v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

**B. Disability under the Social Security Act**

To establish entitlement to disability benefits, a plaintiff bears the burden of proving that he is disabled within the meaning of the Social Security Act. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5, 146–47 (1987). An individual is deemed to be disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according to a five-step sequential process. 20 C.F.R. § 404.1520; <u>Barnhart v. Thomas</u>, 540 U.S. 20, 24–25 (2003); <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 804 (1999); <u>Yuckert</u>, 482 U.S. at 140–42. If it is determined that plaintiff is not disabled at any step in the evaluation process, then the analysis will not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). At step one, it is determined whether plaintiff is working and thus engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If he is, then disability benefits are denied. 20 C.F.R. § 404.1520(b). Step

two requires the ALJ to determine whether plaintiff has "a severe medically determinable physical or mental impairment" or severe combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If he does, then the ALJ determines at step three whether plaintiff's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, then plaintiff is conclusively found to be disabled. 20 C.F.R. § 404.1520(d). If not, then the ALJ at step four assesses whether plaintiff's impairment or impairments prevent him from doing the type of work he has done in the past. 20 C.F.R. § 404.1520(a)(4)(iv).

In assessing an individual's impairments, the ALJ considers all of the relevant evidence in the case record to determine the most the individual can do in a work setting despite the limitations imposed by his mental and physical impairments. 20 C.F.R. § 404.1545(a)(1). This finding is known as the individual's residual functional capacity ("RFC"). Id. If the ALJ concludes that plaintiff's impairment or impairments do prevent him from performing his past relevant work, the analysis proceeds to step five. At this final step, the ALJ evaluates whether plaintiff's RFC, combined with his age, education, and work experience, allows him to perform any other work that is available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is work in the national economy that plaintiff can perform, then disability benefits are denied. 20 C.F.R. § 404.1520(g).

**C. The ALJ's Decision**

In the ALJ's July 1, 2020 decision following the remand of Plaintiff's case, the ALJ found that Plaintiff met the insured status requirement of the Social Security Act through December 31, 2018. Tr. 31. At step one of the sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the onset date of March 1, 2014

through the date last insured. Tr. 31. At step two, the ALJ determined that Plaintiff had the

following severe impairments: "degenerative disc disease with radiculopathy, diabetes,

peripheral neuropathy, carpal tunnel syndrome, tendonitis (shoulders), hypertension, depression

disorder, anxiety, sleep apnea, and obesity[.]" Tr. 31. At step three, the ALJ found that Plaintiff

did not have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 32.

Next, the ALJ determined that during the relevant period:

> [Plaintiff] had the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) except she could never climb ropes, ladders or scaffolds. The
> claimant could never be exposed to unprotected heights or hazardous machinery.
> She could occasionally climb stairs and ramps, balance, stoop, and crouch. She
> could never crawl. The claimant could frequently reach, finger and handle. She
> could have occasional contact with supervisors, co-workers and the public. The
> claimant was able to do only simple and routine tasks.

Tr. 34. At step four, the ALJ determined that during the relevant period, Plaintiff was unable to

perform her past relevant work as a "home attendant." Tr. 40. At step five, the ALJ presented

Plaintiff's RFC limitations, as well as her age, education, and work experience to a vocational

expert. Tr. 41. The vocational expert testified that a hypothetical individual with a similar RFC

would be able to perform the following representative occupations: routing clerk, photocopy

machine operator, and cleaner (housekeeper). Tr. 41. Because there was work in the national

economy that Plaintiff could perform, the ALJ concluded that Plaintiff was not disabled. Tr. 41–

42.

## III.    Legal Analysis

Plaintiff objects to the ALJ's denial of disability benefits after remand on essentially three

grounds: (1) that at step three the ALJ erred in finding that the Plaintiff did not qualify for a

listed impairment; (2) that the ALJ erred in during the course of conducting the Plaintiff's June

17, 2020 hearing when Plaintiff was not represented by counsel; and (3) that the ALJ erred in formulating Plaintiff's RFC assessment. Because the Plaintiff's arguments are unavailing, as explained below, the Commissioner's decision is affirmed.[1]

## A. The ALJ's Step Three Determination

### 1. Listing 1.04

Plaintiff first argues that the ALJ erred in concluding that Plaintiff's spine condition did not meet the criteria of listing 1.04 because objective medical evidence shows that Plaintiff suffered from "stenosis." ECF No. 17 at 13. Listing 1.04 concerns disorders of the spine. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 1.04 (effective May 21, 2020 to April 1, 2021). In order for an ALJ to find that the Plaintiff suffers from listed impairment 1.04, the Plaintiff bears the burden of demonstrating first that she suffers from a disorder such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture" and that the disorder satisfies either the Paragraph A, B, or C criteria under listing 1.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 1.04A, 1.04B, 1.04C (effective May 21, 2020 to April 1, 2021). Paragraph C regarding lumbar spinal stenosis, the provision at issue in Plaintiff's challenge, provides that a plaintiff must show that he suffers from "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 1.04C (effective May 21, 2020 to April 1, 2021).

---

[1] Plaintiff also mentions in passing four "raw medical conditions/evidence" which she claims was not assessed by the ALJ: a severed nerve, fibromyalgia, supraventricular tachycardia, and anemia. ECF No. 17 at 12. However, Plaintiff makes no argument with regard to these conditions as to how those conditions were severe or how they contribute to fulfilling Plaintiff's burden of proving that he is disabled within the meaning of the Social Security Act. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146–47 (1987).

Here, the ALJ found that Plaintiff suffered from the severe impairment of "degenerative disc disease with radiculopathy." Tr. 31. The Plaintiff does cite medical evidence in the record which indicates "mild central stenosis", "cervical spinal stenosis", and "spinal stenosis." Tr. 1587, 1596, 1613, 1655. However, even if the ALJ erred by failing to mention "stenosis" in his analysis of Listing 1.03, Plaintiff does not argue nor cite to any evidence in the record which even suggests that his stenosis caused any difficulties in his ability "ambulate effectively" as required by Listing 1.04 Paragraph C.[2] Instead, as mentioned below, there is significant evidence in the record which notes that throughout her time insured, Plaintiff exhibited "[n]ormal gait." Tr. 1460, 1814, 1858. Without a showing that her stenosis caused an inability to walk, Plaintiff's stenosis does not fulfill the criteria of 1.04 Paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 1.04C. As such, the ALJ's conclusion regarding Plaintiff's qualifications for listing 1.04 was not in error and was supported by substantial evidence.

### 2.    Listing 12.04

Plaintiff also argues that the ALJ committed legal error because he did not analyze Plaintiff's mental affective disorders in accordance with the criteria of Listing 12.04 in place at the time the Plaintiff's case was "submitted" in 2014. ECF No. 17 at 14. Plaintiff's case was filed at the administrative level on May 21, 2014. Tr. 29, 730. However, if Plaintiff is using the word "submitted" to mean the date her case was ready for the ALJ's consideration, that event did not occur until June 17, 2020 at the conclusion of her hearing with the ALJ following remand. Tr. 53, 71–72. Regardless of Plaintiff's intended use of the word "submitted," as a matter of law

---

[2]20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 1.00B2b establishes that "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."

Plaintiff's legal argument fails because the ALJ correctly applied the version of Listing 12.04 which was in effect on July 1, 2020—the date of his decision rather than the date the case was filed.

In exercising judicial review of decisions by the Commissioner of Social Security, for listed impairments courts repeatedly affirm that "[t]he version of the Listings in effect as of the date of the ALJ's decision controls." Brown v. Berryhill, 2017 WL 4638222, at *6 n. 11 (D. Me. Oct. 15, 2017); Berke v. Saul, 2020 WL 6827792, at *9 n. 5 (N.D. Iowa Nov. 20, 2020) ("The version of the listing in effect at the time the ALJ rendered her decision governs the case."); Bernal v. Berryhill, 2018 WL 2441154, at *2 n. 5 (D.N.M. May 31, 2018) ("The relevant regulations and listings are the ones in effect on . . . the date of the ALJ's determination."); see also Marcou v. Berryhill, 2017 WL 4118961, at *6 n. 5 (D. Me. Sept. 17, 2017), report and recommendation adopted, 2017 WL 4411034 (D. Me. Oct. 4, 2017); Page v. Berryhill, 2017 WL 5153401, at *2 n. 2 (D. Me. Nov. 7, 2017), report and recommendation adopted, 2017 WL 6045424 (D. Me. Dec. 6, 2017) ("The version of the Listing in effect on the date of the ALJ's decision governs."). In so concluding, courts have cited the Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, 66138 (Sept. 26, 2016) which provides that "[w]hen the final rules become effective, [the ALJ] will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." The Revised Medical Criteria for Evaluating Mental Disorders also clarifies that "[the Commissioner] expect[s] that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions. If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the

court's remand." Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, 66138 n. 1 (Sept. 26, 2016). Accordingly, upon judicial review of a listed impairment, the court must "review the Commissioner's final decision using the version applied by the ALJ, which is the version in effect 'at the time [the Commissioner] issued the decisions.'" David O. v. Berryhill, 2019 WL 2501884, at *10 n. 14 (D.R.I. Feb. 13, 2019) (citing Dames v. Comm'r of Soc. Sec., 743 F. App'x 370, 372 (11th Cir. 2018)).

Furthermore, Listing 12.04 changed significantly between 2014 and 2020. Both the May 2014 and July 2020 versions of listing 12.04 contain Paragraph A, B, and C criteria. However, under the May 2014 version of Listing 12.04, a plaintiff meets the requirements of Listing 12.04 upon showing that the requirements of both Paragraph A and B are satisfied, *or* when the requirements of only Paragraph C are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12.04 (effective from February 26, 2014 to December 8, 2014). Namely, to meet Paragraph A, a claimant needed to show a "depressive syndrome," "manic syndrome," or "bipolar syndrome" and those conditions must have resulted in at least two of the following Paragraph B criteria: (1) "Marked restriction of activities of daily living;" (2) "Marked difficulties in maintaining social functioning;" (3) "Marked difficulties in maintaining concentration, persistence, or pace;" or (4) "Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12.04A–12.04B (effective from February 26, 2014 to December 8, 2014). Alternatively, under the May 2014 version of Listing 12.04, a claimant could independently qualify for a listed impairment if he met the criteria under Paragraph C, showing a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration" causing more than a "minimal limitation" in the claimant's ability to do basic work combined with one of the three following criteria: (1) "Repeated episodes of decompensation, each of extended duration";

10

(2) "A residual disease process that has resulted in such marginal adjustment that even a minimal

increase in mental demands or change in the environment would be predicted to cause the

individual to decompensate"; or (3) "Current history of 1 or more years' inability to function

outside a highly supportive living arrangement, with an indication of continued need for such an

arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12.04C  (effective from February

26, 2014 to December 8, 2014).

       In contrast, under the version of Listing 12.04 in effect at the time of the ALJ's decision

in July 2020, which is the one that the ALJ actually applied, a claimant has to show different

Paragraph A criteria first, and then the existence of the criteria under either Paragraph B or

Paragraph C. In July 2020, Paragraph A required that Plaintiff show medical documentation of a

depressive disorder or bipolar disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12.04

(effective from March 14, 2018 to April 1, 2021). Paragraph B required that Plaintiff

demonstrate a set of criteria distinct from the criteria of the May 2014 version of listing 12.04,

namely an "[e]xtreme limitation of one, or marked limitation of two, of the following areas of

mental functioning": (1) Understanding, remembering, or applying information; (2) interacting

with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing

oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12.04B (effective from March 14, 2018

to April 1, 2021). Alternatively, in the July 2020 version of Listing 12.04 Plaintiff could show

the Paragraph C criteria in combination with the Paragraph A criteria, and which required a

showing that the Plaintiff's condition is "serious and persistent," meaning that he has a

documented history of treatment of the disorder for at least two years and that she both (1)

undergoes ongoing medical treatment or mental health therapy that diminishes the "symptoms

and signs" of her mental disorder, and (2) has "marginal adjustment," meaning a minimal

capacity to adapt to changes or demands in her environment which are not part of her daily life. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A2, § 12.04C (effective from March 14, 2018 to April 1, 2021).

### B. Plaintiff's Lack of Legal Representation

Finally, the Plaintiff argues that the ALJ erred by allowing her to proceed in the hearing of Jun 17, 2020 without an attorney when she was evidently distraught, confused, and lacked understanding of the hearing. ECF No. 17 at 19–21. Plaintiff also argues that under those circumstances the ALJ failed to adequately develop the record. ECF No. 17 at 21–23. Due to the "not strictly adversarial" nature of social security proceedings, an administrative law judge carries some burden to develop the record. Currier v. Sec'y of Health, Ed. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980) The First Circuit Court of Appeals has expressed that the ALJ's

> responsibility increases in cases where the appellant is unrepresented, where the claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where it is within the power of the administrative law judge, without undue effort to see that the gaps are somewhat filled-as by ordering easily obtained further or more complete reports or requesting further assistance from a social worker or psychiatrist or key witness.

Deblois v. Sec'y of Health & Hum. Servs., 686 F.2d 76, 80 (1st Cir. 1982). Furthermore, "the Secretary's responsibility to develop evidence is even greater when the claimant is obviously mentally impaired." Id. at 81. As such, "[f]airness dictates that when a claimant obviously suffering from a severe mental disorder appears at a social security proceeding without counsel, the ALJ undertake to protect his interests at the hearing." Id.; Torres-Pagán v. Berryhill, 899 F.3d 54, 59–60 (1st Cir. 2018) ("Individuals with psychiatric disorders are often some of the most vulnerable in society and unlike the standard pro se claimant at an SSA hearing, those with

alleged disabilities sounding in mental health may be particularly vulnerable when unrepresented by counsel.").

Even so, "the absence of counsel, without more, creates no basis for remand." Evangelista v. Sec'y of Health & Hum. Servs., 826 F.2d 136, 142 (1st Cir. 1987). A Plaintiff who proceeds pro-se at a social security hearing is not entitled to remand without "something extra. Thus, remand for want of representation is necessitated only where there is a showing of unfairness, prejudice or procedural hurdles insurmountable by laymen." Id. (internal quotations omitted). The claimant should identify or offer proof of the prejudice or unfairness that resulted from his self-representation and which warrants remand. Id.

Additionally, the risk of unfairness and prejudice may be greatly reduced upon consideration of the claimant's education, experience in the administrative process, prior representation by counsel in other social security proceedings, and by a knowing and intelligent waiver of his right to counsel. Id. For example, in Evangelista v. Sec'y of Health & Hum. Servs., 826 F.2d 136 (1st Cir. 1987) the court determined that the Plaintiff's self-representation at his social security hearing did not warrant remand. Id. In particular the court discussed how the plaintiff was "an experienced claimant who had already been through the administrative process once before with counsel—made a knowing and intelligent waiver of his right to representation after having been informed, both orally and in writing, of his right to counsel." Id. at 143 ("[Plaintiff] had the benefit of participation in a prior disability hearing during which he was assisted by counsel throughout."). Even though the plaintiff in Evangelista "had only a tenth grade education" the court found that "he was a mature individual who had worked in a variety of white-collar positions requiring good comprehension and communicative skills." Id. at 142. As such, the court held that "there was no unfairness in acceding to [plaintiff's wish]" to proceed

without counsel; "a claimant, after all, has as much right to proceed pro se as he does to engage a lawyer." Id. Additionally, the court in Evangelista noted that the plaintiff seemed comfortable, made his points well, presented medical evidence, and the ALJ was "solicitous in attempting to assist the plaintiff", offering to give the plaintiff time to complete the record or obtain other medical evidence or reports. Id. at 143. Although the court did not "assert that Evangelista fared as well, or presented his case as ably, as if a skilled lawyer had been retained" the court nevertheless held that the fact that the plaintiff appeared pro-se at his social security hearing did not merit good cause for remand. Id.

Here, Plaintiff has not made a showing that at her hearing before the ALJ she was faced with "unfairness, prejudice or procedural hurdles insurmountable by laymen." Id. at 142. From the beginning of the hearing on June 17, 2021, Plaintiff's communications indicate a pro se Plaintiff who was aware of what was happening during the proceedings. A review of the transcript of the hearing does not suggest that she lacked an understanding of the proceedings which resulted in unfairness or prejudice.

At the hearing, Plaintiff was able to clearly respond to the ALJ's questions regarding her age ("Fifty-four"), highest level of education ("Two years of college"), where she attended college ("Essex Country [sic] College in Newark"), her ability to speak English, ("I understand it, but to speak it, it's a little—I have trouble with understanding.")[3], the date that she last worked ("In 2013."), her experience with English and Spanish while in college, her history of taking care of her sister in Puerto Rico in 2017, and the duties of her prior job as an "[a]ssistant home resident", explaining that she worked "Helping seniors at their home . . . taking care of their needs, and their chores, and their hygiene. . . . . I want to clarify that I worked with

---

[3] An interpreter was available at the hearing. Tr. 55.

bedridden patients. We had to do everything for them in bed." Tr. 61–63. Plaintiff also clearly communicated that she had submitted additional medical records which she wished to be considered in her file, stating "I have a document from when I was hospitalized. I sent it in, and I called the court, and they let me know they had received it. And it's from medical studies." Tr. 60.

Furthermore, in light of the above information, the hearing transcript from June 17, 2021 indicates that Plaintiff knowingly and intelligently waived her right to be represented by counsel. Plaintiff had been previously represented and aided by an attorney, Mr. Glenn Carey ("Mr. Carey" or "Plaintiff's attorney") at her earlier Social Security hearing held on May 15, 2017. Tr. 73–100. However, at her hearing following remand, on June 17, 2021, Plaintiff informed the court "I had Attorney Glenn Carey, but I removed his as a representative on May 7, 2018, when he received a letter saying that I removed him as the representative. I can explain for you why if you want me to." Tr. 56. The ALJ then asked,

> [ALJ]: . . . Did you receive a letter from us advising you of your right to representation?
>
> [Plaintiff]: Yes.
>
> [ALJ]: OK. And that letter contained information about obtaining representation and also legal services that may be available to you. Did you understand the information contained in that letter that you received?
>
> [Plaintiff]: Well, no. I called the court and asked them if it was necessary for me to have a lawyer, and they told me, "No."
>
> [ALJ]: OK, that is correct. You don't have to have an attorney, but my question to you was not whether you needed an attorney or not. It's did you understand the information in the letter we sent you regarding representation?
>
> [Plaintiff]: I don't know what to say because the problem is that that I don't have economic solvency to be able to afford an attorney.
>
> [ALJ]: Oh, OK. Ma'am, I'm not asking you if you—I think there's a misunderstanding here. All I'm asking you—I'm not asking you whether you can get an attorney or not.

> That is not my question. My only question to you right now is whether you understand
> that you have a right to have a representative at this hearing?
>
> [Plaintiff]: Yes, I understand that.

Tr. 56–57. Therefore, while Plaintiff seemed to confuse the difference between her right to

counsel and her ability to afford counsel, the ALJ adequately assured that Plaintiff had been

informed both in writing and orally that she had a right to counsel at the social security hearing.

Thereafter, the ALJ asked, "OK. Knowing that you have that right, do you want to proceed today

without a representative as you had before with Mr. Carey?" to which Plaintiff responded, "Yes,

I want to proceed." Tr. 57. Nothing about Plaintiff's answers to any of the ALJ's questions

would indicate that Plaintiff was suffering from an obvious mental impairment or failed to

understand either the ALJ's questions or that she had been informed and understood her right to

counsel. Furthermore, considering Plaintiff's two years of college education, her clear answers to

the ALJ's questions, and the fact that she had previously had the benefit of legal representation

in a prior hearing, it is evident that Plaintiff's affirmative waiver of her right to counsel was

made both knowingly and intelligently.

An examination of the June 17, 2021 hearing transcript shows that Plaintiff only

demonstrated some confusion during part of the vocational expert's ("VE") testimony. When the

VE was explaining her qualifications at the hearing, Plaintiff became confused and objected to

the testimony, saying,

> [Plaintiff]: I didn't work in those jobs that she says I worked.
>
> VE: No, it's my experience that I'm talking about.
>
> [Plaintiff]: What she has? What I'm understanding now. What she's saying is
> what she says. That's what she's saying about her, what she has?
>
> ALJ: Ms. Rosario, the only question I have to you is, do you have any objections
> to the vocational expert's qualifications? Her jobs, her education.

[Plaintiff]: The thing is, I don't understand. I don't understand. I'm not understanding the questions.

Tr. 66–67. At that point, the ALJ explained, "OK, the only question to you is—let me just backtrack. . . . the vocational expert just told you about her education and work experience. My only question to you is, is it OK for her to testify as a vocational expert in this case?" Tr. 67. After having received that explanation, the Plaintiff's confusion was cleared away, and Plaintiff stated, "Yes, I understand now. Yes, if she has that, I accept it. Yes, of course. If she has those degrees, and that's her profession, I have to accept it. Yes." Tr. 67. From then, the rest of the hearing proceeded unimpeded without any further confusion. See Tr. 68–72. The court cannot expect Plaintiff to perform or behave to the standard of "a skilled lawyer" during her hearing, and it is understandable that a lay person may become confused during some parts of an administrative hearing. Evangelista, 826 F.2d at 143. It also cannot be ignored that Plaintiff was listening to the hearing via telephone and was aided by a Spanish-language interpreter—the logistics of which can cause additional, unintended, but unavoidable confusion. Tr. 55.

Here, however, Plaintiff has pointed to no failing on the part of the ALJ which resulted in unfairness or prejudice. Plaintiff argues that the ALJ's question to Plaintiff stating, "Ms. Rosario, this is your time to tell me anything that you think is important regarding your case" was inadequate and not specific enough with regard to her medical conditions. Tr. 63; ECF No. 17 at 20–21. However, Plaintiff offers no suggestion as to what specific questions should have been asked to Plaintiff in light of the extensive record in this case. Indeed, in her response to the ALJ's question, while at times rambling, Plaintiff's emphasized her pain and depression, stating "I always have pain with my medical conditions. I have severe depression, which has led me—I can't work. . . . I wake up every day in pain. The pain is chronic and exhausting for my mind and

body." Tr. 64. The ALJ also afforded Plaintiff the opportunity to object to any documents in the record (Tr. 59), voice objections to the VE's qualifications (Tr. 65), ask questions of the vocational expert (Tr. 70), and to ask questions directly to the ALJ (Tr. 71). The ALJ was also careful to explain to Plaintiff the purpose of the hearing and summarized the vocational expert's testimony to the Plaintiff before offering Plaintiff a chance to ask questions. Tr. 60, 69–70.

Plaintiff also fails to identify any gaps in the record which the ALJ should have filled by further "developing the record" during the hearing through either Plaintiff's testimony or additional record evidence. See ECF No. 17 at 23. When ordering remand on December 3, 2018, the Appeals Council directed the ALJ to "[o]btain updated additional evidence concerning the claimant's impairments in order to complete the administrative records in accordance with the regulatory standards regarding consultative examinations and existing medical evidence" and to "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitation[.]" Tr. 782–83. At the Plaintiff's hearing from May 15, 2017, the ALJ had admitted twenty-eight exhibits into the record. Tr. 76 ("OK, at this point, documents 1A-28F would be admitted into the record."). In contrast, at the Plaintiff's hearing on June 17, 2020, the ALJ admitted seventy-two exhibits into the record ("Then, at this point, exhibits 1A to 72F are admitted into the record."). Included in those exhibits is evidence dating to after Plaintiff's May 15, 2017 hearing, in accordance with the Appeals Council's directives that the ALJ obtain additional evidence to complete the administrative record. E.g. Tr. 1589–1593, 1613–16, 1672, 2835–71. The ALJ even admitted evidence which originated through and after the Plaintiff's date last insured of December 31, 2018. See e.g. Tr. 2802–2914; Patoski v. Berryhill, 320 F. Supp. 3d 283, 291 (D. Mass. 2018), aff'd, 2019 WL 2574591 (1st Cir. June 24, 2019) ("The ALJ may

18

consider medical evidence <u>after</u> the DLI for what light (if any) it sheds on the question whether claimant's impairment(s) reached disabling severity before claimant's insured status expired.") (internal citations omitted, emphasis in original). The ALJ's actions therefore complied with his duty to develop the record and care for the interests of Plaintiff as an unrepresented person.

In sum, taking into account: Plaintiff's education, work experience, and prior experience in an administrative process during which she was represented by counsel; the fact that during the hearing on June 17, 2020 she knowingly opted to proceed without counsel even though she knew that she had the right to retain the services of one; the fact that during the June 17, 2020 the ALJ took the time to provide clarifying explanations or follow-up questions; and the fact that the Plaintiff has not identified or offered proof of any prejudice, unfairness, or gaps in the record, Plaintiff has failed to show the basis for a remand. <u>Evangelista v. Sec'y of Health & Hum. Servs.</u>, 826 F.2d 136, 142 (1st Cir. 1987).

**C. The ALJ's RFC Determination**

Furthermore, in this case, the ALJ adequately developed the record to support his physical and mental RFC determination with substantial evidence, also addressing the requirements of the Appeals Council. When formulating a claimant's RFC, the ALJ must base his determination on all relevant evidence, including a claimant's medical record, the medical opinions, and a claimant's descriptions of her limitations. 20 C.F.R. §§ 404.1545, 404.1546. A claimant's RFC is the most she can do despite limitations from her impairments. <u>Id</u>. The claimant bears the burden of providing evidence to establish how her impairments limit her RFC. 42 U.S.C. § 423(d)(5)(A); <u>Freeman v. Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001).

### 1.    Physical RFC

Regarding Plaintiff's physical RFC, Plaintiff argues that the ALJ erred in formulating the physical RFC determination because he failed to correctly apply the treating physician rule with regard to Plaintiff's physical RFC. ECF No. 17 at 8–12. Specifically, Plaintiff argues that the ALJ erred in granting "limited weight" to the opinions of Dr. Joseph Salese ("Dr. Salese") and Dr. Frederick Gangemi ("Dr. Gangemi"). ECF No. 17 at 10–11. For claims filed before March 27, 2017 the social security process grants "more weight to medical opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). The ALJ, however, is not always required to give controlling weight to the opinions of treating physicians. Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2–3 (1st Cir. 1987); Rivera-Tufino v. Comm'r of Soc. Sec., 731 F. Supp. 2d 210, 216 (D.P.R. 2010). Rather, the ALJ can give less weight to a treating physician's opinion if he provides "good reasons" to do so. Polanco-Quinones v. Astrue, 477 F. App'x 745, 746 (1st Cir. 2012) (per curiam) (citing 20 C.F.R. § 404.1527(d)(2)); Pagán-Figueroa v. Comm'r of Soc. Sec., 623 F. Supp. 2d 206, 210–211 (D.P.R. 2009) (citing Carrasco v. Comm'r of Soc. Sec., 528 F. Supp. 2d 17, 25 (D.P.R. 2007)). For example, an ALJ is only required to abide by the "treating source rule" when the opinion by a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] record." <u>Polanco-Quinones</u>, 477 F. App'x at 746 (quoting 20 C.F.R.

§ 404.1527(c)(2)).[4]

Plaintiff's Social Security claim was filed on May 21, 2014, and so the ALJ's opinion is

subject to the treating physician rule. Tr. 29, 730. Here, in formulating Plaintiff's RFC, the ALJ

gave less than controlling weight to the opinions of Plaintiff's treating physicians Dr. Salese and

Dr. Gangemi who conducted RFC assessments on October 17, 2017 and November 8, 2017

respectively. Tr. 38–39; 1603, 1611. The ALJ, however, gave good reasons to give less than

controlling weight to these opinions. The ALJ stated that for both Dr. Salese and Dr. Gangemi

their opinions were "largely unsupported by rationale or narrative explanation, and [they do] not

describe significant clinical or diagnostic findings, citing primarily to the claimant's subjective

complaints of pain." Tr. 38–39. For example, among other assessments, both Dr. Salese and

Dr. Gangemi assessed that Plaintiff could only occasionally and frequently lift less than ten

pounds and stand less than 2 hours in an eight-hour workday. Tr. 1597, 1606. However, when

asked to "[e]xplain how and why the evidence supports your conclusions" Dr. Salese merely

noted Plaintiff's diagnosis of "lumbar radiculopathy and cervical spine stenosis", and bilateral

leg numbness. Tr. 1597. Dr. Gangemi offered no explanation for his assessment. Tr. 1605.

While, as the ALJ notes, Dr. Salese and Dr. Gangemi make reference to Plaintiff's pain in their

assessments, they offer very sparse support or explanation for their conclusions regarding

Plaintiff's physical limitations. At most, Dr. Gangemi expressed that his assessment of how

environmental factors impair Plaintiff based on "History and Physical Examination in my

---

[4] For cases filed after March 27, 2017, the Code of Federal Regulations created a new standard requiring that ALJs not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [plaintiff's] medical sources." 20 C.F.R. § 404.1520c. Instead, an ALJ must consider a series of five factors when considering medical opinions and prior administrative medical findings, the most important of which are "supportability" and "consistency." 20 C.F.R. § 404.1520c(b)(2); (c)(1)–(2) (the five factors being supportability, consistency, relationship with the plaintiff, specialization, and other factors).

office." Tr. 1608. The ALJ also took issue with the fact that neither Dr. Salese nor Dr. Gangemi defined what "limited" meant in terms of "weight, duration, or other quantifiable measure" when they determined that Plaintiff was "limited" in activities such as reaching and handling. Tr. 39, 1599, 1607.

Instead, the ALJ concluded that that the "extreme limitations assessed" by Dr. Salese and Dr. Gangemi were "largely inconsistent with the normal to generally mild to moderate abnormalities noted on physical examinations and diagnostic testing[.]" Tr. 38–39. For example, the ALJ cited to some examinations, such as those conducted by Dr. Ivan Chen, MD ("Dr. Chen") in April and December 2015, in which it was reported that Plaintiff had some decreased musculoskeletal range of motion and tenderness. Tr. 1490, 1526. However, the ALJ also cited to several other examinations throughout Plaintiff's period of disability insurance coverage wherein physicians reported that Plaintiff had a normal range of musculoskeletal motion, normal strength, normal gait and no swelling or tenderness. Dr. Salese himself reported in September 2014, October 2016, and—after he had provided his much more limiting RFC assessment—in January 2018, that Plaintiff exhibited a "[n]ormal range of motion, [n]ormal strength, [n]o tenderness, [n]o swelling, [n]o deformity, and [n]ormal gait." Tr. 1460, 1814, 1858. Additionally, the progress notes from March 28, 2018 of treating rheumatologist Dr. Sushama Mody, MD ("Dr. Mody") reported with that Plaintiff had a "normal range" of musculoskeletal motion. Tr. 2783. Toward the end of Plaintiff's period of coverage, treating physician Dr. Abel González ("Dr. González") likewise reported in November 2018 that Plaintiff exhibited a normal range of musculoskeletal motion, normal strength and no swelling, and that Plaintiff showed normal motor function. Tr. 1773.

Finally, the ALJ also cited to the opinions of the reviewing state agency medical consultants Dr. David Schneider ("Dr. Schneider") and Dr. Deogracias Bustos ("Dr. Bustos"), who each opined in October 2014 and February 2015 respectively, that Plaintiff only has a "moderate physical impairment with the residual functional capacity to perform light work", including the ability to occasionally lift and carry twenty pounds and ten pounds frequently, and is able to stand, walk, and sit for about six hours in an eight hour workday with unlimited ability to push and pull an with no postural or environmental limitations. Tr. 737–40, 754–56. The ALJ nevertheless gave partial weight to the opinions of Dr. Schneider and Dr. Bustos due to the fact that "evidence of carpal tunnel syndrome" and additional physical limitations was submitted after Dr. Schneider and Dr. Bustos had prepared their assessments. In sum, the ALJ did not err by declining to give Dr. Salese and Dr. Gangemi's opinions controlling weight as the ALJ gave good reasons based on other substantial evidence in the record.

However, Plaintiff further argues that the ALJ erred in not making an express description in the RFC regarding the number of hours Plaintiff can sit, stand, walk, the amount of weight she was able to lift, and how often. ECF No. 17 at 12. SSR 96-8p requires that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p. In determining a plaintiff's "physical abilities" an ALJ is to assess "the nature and extent of [a plaintiff's] physical limitations" to perform work activities "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or

crouching)." 20 CFR 404.1545(b). However, "the specific functions listed in SSR 96–8p 'are only illustrative of the functions potentially relevant to an RFC assessment[.]'" Beaune v. Colvin, 2015 WL 4205251, at *3 (D.N.H. July 10, 2015) (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir.2013)). Therefore, "[a]lthough an ALJ should ideally address all of the functional limitations associated with a claimant's impairments in his RFC finding, courts have held that a failure to do so will not invalidate the decision if the functional limitations can be inferred from the record as a whole." Beaune, 2015 WL 4205251, at *3. For example, citing its "sister Circuits" the Court of Appeals for the Second Circuit has held,

> Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed."

Cichocki, 729 F.3d at 177 (citing Zatz v. Astrue, 346 Fed. Appx. 107, 111 (7th Cir.2009) ("[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence."); Depover v. Barnhart, 349 F.3d 563, 567–68 (8th Cir. 2003) ("[W]e believe that the ALJ implicitly found that Mr. Depover was not limited in these functions, and in this instance we do not see any reason to remand to make the findings explicit."); Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."). Accordingly, an ALJ who "failed to touch all the bases" nevertheless only commits harmless error if "the record demonstrates that he sufficiently performed the function-by-function assessment required by SSR 96-8p." See Beaune, 2015 WL 4205251, at *5.

Here, the ALJ's explicit function-by-function RFC assessment included a high degree of detail, stating that Plaintiff

> had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could never climb ropes, ladders or scaffolds. The claimant could never be exposed to unprotected heights or hazardous machinery. She could occasionally climb stairs and ramps, balance, stoop, and crouch. She could never crawl. The claimant could frequently reach, finger and handle.

Tr. 34. While the ALJ did not explicitly mention in the RFC the weight or time limitations in Plaintiff's ability to walk, sit, stand, lift, and carry, these functional limitations can be inferred from the record as a whole and any failure by the ALJ to expressly transcribe each work-related function was harmless error. As already discussed above, the ALJ considered and weighed the opinions of treating physicians Dr. Salese and Dr. Gangemi as well as the opinions of Dr. Schneider and Dr. Bustos who all assessed Plaintiff's lifting, carrying, walking, standing, and sitting abilities. Furthermore, the definition for "light work" under 20 CFR 404.1567(b) contains a definition regarding lifting, carrying, walking, standing, and sitting which indicates that the ALJ gave more weight to the assessments of Plaintiff's limitations in these functions by Dr. Schneider and Dr. Bustos. Under 20 CFR 404.1567(b), light work is defined as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 CFR 404.1567(b). Here, the ALJ clearly found that the Plaintiff was not substantially limited in lifting, carrying, walking, standing, and sitting beyond the range of light work contained in 20 CFR 404.1567(b), based on the evidence from the record as a whole, and there is no reason to remand in order to make these conclusions explicit.

### 2.    Mental RFC

Plaintiff also argues that the ALJ erred in formulating Plaintiff's mental RFC because he did not consult a medical expert as required by the Appeals Council, and instead impermissibly interpreted raw medical data. ECF No. 17 at 16–19. As a lay person, "an ALJ is not qualified to interpret raw data in a medical record in functional terms." See Pérez v. Sec'y of Health & Human Servs., 958 F.2d 445, 446 (1st Cir. 1991); see also Valentín-Rodríguez v. Comm'r of Soc. Sec., 2014 WL 2740410, at *7 (D.P.R. June 17, 2014) ("An ALJ cannot rely on raw medical data; rather, he must look to physician's opinions to translate that evidence into functional terms."). "[T]he ALJ must measure the claimant's capabilities and 'to make that measurement, an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.'" See Manso-Pizarro, 76 F.3d at 17–18 (quoting Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991).

Contrary to Plaintiff's representations, the Appeals Council in Plaintiff's case left the decision of whether to obtain evidence from a medical expert to the discretion of the ALJ, instructing the ALJ that he should "If warranted, obtain evidence from a medical expert related to impairments the nature of severity of and functional limitations resulting from the claimant's mental impairments[.]" Tr. 783 (emphasis added). The ALJ's analysis regarding Plaintiff's mental RFC in the decision at issue is much more robust, citing to more sources and including more analysis, than the decision that led to the remand which was issued on August 1, 2017. Tr. 37, 772. In Plaintiff's July 1, 2020 decision, the ALJ cited extensive evidence in determining Plaintiff's mental RFC from the year 2014 through the date last insured, including examinations by numerous mental health professionals.

26

For example, the ALJ cited the "Mental Status Examination" performed on October 27, 2014 by Licensed Psychologist Paul Fulford, Ph.D. ("Dr. Fulford"). Tr. 1419–21. In that examination, Dr. Fulford reported that Plaintiff's short term memory was fair as she was able to recall four numbers forward and four number backwards but could not recall the name of the previous President of the United States. Tr. 1420. Dr. Fulford also found that Plaintiff's "mental control was good" and that considering her education, "her level of intelligence appears to be within normal limits." Tr. 1421. Dr. Fulford noted that Plaintiff had "fair concentration", being able to spell the word "mundo" forwards but not backwards, and being able to make very small calculations, such as subtracting 4 from 5 but not "$7.50 from $18." Tr. 1420.

Although the ALJ cited that Dr. Fulford found Plaintiff's judgment to be "impaired," he also noted Dr. Fulford's observation that Plaintiff was cooperative during his examination of her, a description that was repeated by other health providers in the record. Tr. 1420–21. For example the ALJ cited a September 2014 mental status evaluation of Plaintiff conducted at Mount Carmel Guild Behavioral Healthcare in which Plaintiff was described as cooperative. Tr. 1389–94. Like Dr. Fulford's assessment, the Mount Carmel Guild Behavioral Healthcare assessment reported that Plaintiff had "average" intellectual functioning with fair insight and intact thought processes. Tr. 1393. Her speech was also reported as normal and her judgment as "good." Tr. 1393. The ALJ also cited a psychiatric evaluation from Northwest Essex Community Healthcare Network from August 2016 which similarly noted that Plaintiff exhibited normal speech patterns, and that she was oriented in person, time, and place with intact memory and concentration. Tr. 1555. As with Dr. Fulford's examination, however, Plaintiff's judgment and insight were reported as poor and with cognitive functioning "[a]t baseline." Tr. 1555–56. Finally, the ALJ also cites to the progress notes by treating physician Dr. Devang Gandhi, MD who reported throughout

September and November 2018 that his observations with regard to Plaintiff's psychiatric state indicate she was "cooperative, [a]ppropriate mood [and] effect, [n]ormal judgment, [n]on-suicidal." Tr. 1773, 1779, 1783. Therefore, in this case, the ALJ properly relied on the opinion of Dr. Fulford as well as other substantial evidence in the record to determine Plaintiff's mental RFC, in accordance with the directives of the Appeals Council and his own discretion. As such, the ALJ adequately addressed the instructions of the Appeals Council with regard to Plaintiff's mental RFC, and his determination was supported by substantial evidence.

## IV.    Conclusion

Based on the foregoing analysis, the court concludes that the decision of the Commissioner that Plaintiff was not entitled to disability benefits was supported by substantial evidence and contained no legal error. Therefore, the Commissioner's decision is hereby AFFIRMED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 31st day of March, 2023.

s/Marcos E. López
U.S. Magistrate Judge